KENNETT–MURRAY CORPORATION, Plaintiff-Appellee,

v.

John E. BONE, Defendant-Appellant.

No. 78–3590.

United States Court of Appeals, Fifth Circuit.

Aug. 1, 1980.

Theodore L. Hall, Mobile, Ala., for defendant-appellant.

Michael J. Salmon, Mobile, Ala., for plaintiff-appellee.

Before AINSWORTH and CHARLES CLARK, Circuit Judges, and HUNTER *, District Judge.

AINSWORTH, Circuit Judge:

In this Alabama diversity case, Kennett-Murray Corporation (Kennett-Murray) brought suit against John E. Bone seeking recovery on a promissory note and an employment contract. Bone's defense was that no consideration existed for the note because he was fraudulently induced to sign the employment agreement. The district court granted Kennett-Murray's motion for summary judgment. On appeal, Bone argues that the district court improperly disregarded his affidavit which he claims raised a genuine issue of material fact. We agree, and accordingly reverse the grant of summary judgment.

Appellant Bone was employed by Kennett-Murray in July 1974 as the manager of its newly-acquired stockyard located in Linden, Alabama. Shortly after commencing work, Bone signed an employment contract covering the fiscal year running from May 1, 1974 until April 30, 1975. The contract provided that he would receive a weekly salary of $200 plus 50% of the stockyard's net profits. The contract also provided, in paragraph 3(a), that

[i]f the Division shall suffer a net operating loss in any year during the term of this agreement, including any extension hereof, *such loss shall be applied against future net profits during the term of this agreement,* including any extension thereof, so that the amount of compensation which JOHN E. BONE shall be entitled to receive shall be the net profits for the current year reduced by net losses, if any, in prior years which have been previously applied against net profits. (emphasis supplied)

The 1974 contract was for a one-year term.

On June 28, 1975, Bone met with John Speights, Vice-President of Kennett-Murray, for the purpose of signing an employment contract to replace the expired 1974 agreement. Accordingly, Bone signed a new contract as well as a promissory note evidencing his liability to the corporation in the amount of $10,487.50. The 1975 contract was similar in length and form to the 1974 agreement with one major exception. Unlike the earlier version providing that any net losses would act to offset Bone's share of future profits, the 1975 contract made Bone personally liable to the corporation for one-half of all net losses. Specifically, paragraph 3(c) of the 1975 agreement provided that

[i]n the event that the Division shall incur a net operating loss for any such fiscal year (starting with the fiscal year beginning May 1, 1974), then Employee *agrees to pay to K-M an amount equal to the Employee's Percentage of any such loss.* Any such sum which may be owed to K-M by Employee shall be established upon the books of K-M as a receivable from Employee. Employee shall not be entitled to receive a bonus in subsequent years until the full amount of the net operating loss incurred by such Division has been recovered, so that the bonus received by Employee in subsequent years shall be the net profits for such year, reduced by any net losses incurred

---

* United States District Judge of the Western District of Louisiana, sitting by designation.

in prior years. In the event that such losses shall not be recovered within the following two fiscal years, then Employee agrees to pay the amount of his outstanding account owed to K-M when requested by the Board of Directors of K-M. (emphasis supplied)

The new agreement effectively rescinded the earlier contract's provision dealing with the treatment of losses since it provided that the new loss-sharing arrangement would begin with the fiscal year commencing May 1, 1974, which included the period covered in the 1974 contract. The promissory note signed by Bone reflected this change as its face value purported to represent Bone's share of the stockyard's losses for the 1974 fiscal year.

Bone continued to manage the Linden operation until he tendered his resignation on March 14, 1977. On March 17, Kennett-Murray wrote Bone advising him of his obligations under the 1975 contract for the stockyard's losses. The letter stated that Bone's share of the losses for the fiscal year beginning May 1, 1975 and ending April 30, 1976 totalled $16,823.50 and that further losses were expected for the subsequent fiscal year in an amount to be determined by the corporation's accountant. The letter from Kennett-Murray also notified Bone that the promissory note signed on June 28, 1975 representing his share of the losses for the 1974 fiscal year was now due and payable according to the terms of the note.

Bone refused payment on any of the demands, and Kennett-Murray brought suit in federal district court seeking enforcement of the promissory note and the 1975 employment contract.[1] In his answer to the first cause of action, Bone stated that he was not indebted to Kennett-Murray on the promissory note since he owed the company nothing as of June 28, 1975, when he met with Speights to sign the new contract, and that there existed no consideration for the making of the note. With respect to the employment contract, Bone simply averred

that he was "not indebted to the Plaintiff." (Rec. p. 10). Bone also requested a jury trial.

Discovery followed and Bone's deposition, of particular importance to the resolution of this appeal, was taken on February 23, 1978. In the seventy-page deposition, Bone was questioned on his complete employment history with Kennett-Murray. In light of the allegations made in the original answer, much of the deposition focused on the specific events of the June 28 meeting between Bone and Speights when the note and contract were signed. At one point in the deposition, Bone stated that Speights "didn't say anything" about either the note or the employment contract (Bone Deposition p. 27), except that Speights said he wanted the note signed so that the president of Kennett-Murray would "get off his back." (Bone Deposition p. 26). Bone admitted that he never read the contract, and explained his failure to do so because he thought that it was the same as the 1974 contract. Thus, the deposition contains statements that Speights said nothing to Bone about either document that could be construed as a fraudulent misrepresentation. Yet, other statements call this interpretation into question. With respect to the note, Bone testified that he "was led when [he] signed this note to believe that [the money] was to go back in the barn for the operation expense." (Bone Deposition p. 23). Furthermore, Bone reiterated his reasoning for not reading the contract by stating that he "thought it was just like the first one, because he [Speights] said it was the same contract." (Bone Deposition p. 60).

On April 21, Bone moved for leave to file an amended answer under Rule 15, Fed.R. Civ.Proc. 15. Kennett-Murray opposed the motion. Initially, leave to amend was denied, but upon motion to reconsider, the district court permitted amendment. Under the amended answer, Bone claimed that at the time of the signing of the promissory

---

1. The complaint also alleged that Bone owed Kennett-Murray $1,840.00 for twenty-three head of cattle bought by Bone. Bone apparent- ly acknowledges his indebtedness on this matter and in any event this issue is not presented for appeal.

note, Speights told him that the "money would go back into the Linden operation" and not be an obligation of Bone's to the corporation. Bone asserted that this representation was both false and material. As regards the employment contract, Bone claimed that Speights represented that it was the same as the earlier agreement. Thus, even though Bone did not read the contract, his "failure to read said agreement was induced by the false and material representation" made by Speights and relied on by Bone. (Rec. 76).

Prior to trial, Kennett-Murray moved for summary judgment on the basis of the pleadings, the joint pre-trial order filed by the parties, and various depositions of which Bone's deposition was the most important. Bone opposed the motion arguing that genuine issues of material face existed which precluded the grant of summary judgment. Along with his written opposition to the motion, Bone submitted a two-page affidavit in which he explained parts of his earlier deposition testimony. Specifically, the affidavit supported his allegations of fraud contained in the amended answer in that Bone stated in his affidavit that Speights "said something to the effect that this contract would serve to renew my first contract and that they were just alike or that they were the same contract." [2]

---

2. The complete affidavit reads as follows:

My name is John Ed Bone, I reside at Route 2, Marion, Alabama, which is in Perry County, and I am the person whose deposition was taken by Mr. Michael J. Salmon, Attorney for the Plaintiff.

The deposition in question was taken on February 23, 1978, before G. R. Williams, reporter for Charles A. Howard and Associates of Mobile, Alabama.

On page 26 of the deposition Mr. Salmon was asking me questions primarily concerning the promissory note:

"Q . . . Just tell us exactly, as you remember it, everything that Mr. Speights told you about this promissory note, Plaintiff's Exhibit number 3, at the time that you signed it?"

"A . . . He did not tell me anything. He just laid it down on the desk. And I looked at it. And he said sign it to get Mr. Flanigan off of his back. And that is all he said".

On many previous occasions, prior to the signing of this note, Mr. Speights had told me that if the stock yard ever needed money that we could go to the First Bank of Linden, Alabama, and borrow it. Mr. Speights even went so far as to write a letter to the bank telling the bank that if I ever needed operating money to let me have it and sign the note for the company.

Therefore, when Mr. Speights presented the note to me for my signature and told me that he wanted me to help him "get Mr. Flanagan off his back," I naturally assumed that the note was a company note, and that I was signing it in my capacity as manager of the Linden Stock Yard.

Nothing was said about the employment contract until after the note had been signed. This can get a bit confusing, because the employment contract was signed on the same occasion, but *after* the matter concerning the note.

My first employment contract had expired. The first contract provided that it had to be renewed each year. I had contacted Mr. Speights several times about renewing my contract—usually by telephone. During the course of those conversations nothing was ever said about changing the terms of my original contract—I just wanted to get it renewed for another year because at that time I was working without a contract.

Therefore, after he got me to sign the note—and after that matter was behind us—I again asked Mr. Speights about renewing my contract. At that point he went back into his little storage or supply room—just off his office—and came out with a contract in his hand. He said something to the effect that this contract would serve to renew my first contract and that they were just alike or that they were the same contract.

On page 27 of the deposition Mr. Salmon asked me the following question:

"Q . . . No, no, sir. If you would answer my question. I am talking about the time that you signed Plaintiff's Exhibit 2, the agreement of 1975, and at the same time you signed the promissory note. I am trying to get you to state as exactly as you can everything and anything Mr. Speights told you about *this* document?"

Up to this point the deposition had concerned the promissory note. The manner in which the above question was asked, particularly with the use of the word "this", caused me to misunderstand. I felt that Mr. Salmon was still referring to the promissory note. Therefore, my answer to the question was:

"A . . . He didn't say anything."

which is true. He didn't say anything about the promissory note except that he wanted me to sign it to get Mr. Flanagan off his back. And nothing was said about the contract until the matter concerning the note was finished and behind us. But when he brought out the contract as previously explained, he did say words to the effect that this was the same contract as my previous contract.

On August 24, 1978, the district court granted Kennett-Murray's motion for summary judgment relying primarily on statements in Bone's deposition that Speights had not made any representations about either the note or the employment contract. The district court expressly discounted the issue raised by Bone's affidavit on the ground that it was inconsistent with his deposition testimony. "The defendant's affidavit in opposition to summary judgment contradicts his own deposition with respect to whether the agent (Speights) made any representation at all to him concerning the contract and, the Court is convinced, is not to be given great weight." (Rec. 104). Judgment in favor of Kennett-Murray was entered on both counts of the complaint.[3]

The only issue presented on appeal is the propriety of the grant of summary judgment. Under Rule 56, summary judgment can only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The burden of proof falls upon the party seeking the summary judgment, and all reasonable doubts as to the existence of a genuine issue of material fact "must be resolved against the moving party." *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980). *See Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Insurance Co.*, 606 F.2d 602, 609 (5th Cir. 1979). *See generally* C. Wright, *Law of Federal Courts* 493–95 (3rd Ed. 1976). The

district court must consider all the evidence before it; summary judgment can be entered only "if *everything* in the record— pleadings, depositions, interrogatories, affidavits, etc.—demonstrates that no genuine issue of material fact exists." *Keiser, supra*, 614 F.2d at 410 (emphasis in original). In this regard, the district court must not resolve factual disputes by weighing conflicting evidence, *Farbwerke Hoeschst A. G. v. M/V "Don Nicky,"* 589 F.2d 795, 798 (5th Cir. 1979), since it is the province of the jury to assess the probative value of the evidence. *See, e. g., Gross v. Southern Railway Co.*, 414 F.2d 292, 297 (5th Cir. 1969); *Gauck v. Meleski*, 346 F.2d 433, 436 (5th Cir. 1965). *See generally Whitaker v. Coleman*, 115 F.2d 305 (5th Cir. 1940).

In order to avoid the grant of summary judgment, a party must demonstrate both the existence of a material fact and a genuine issue as to that material fact. A fact is material if it constitutes a legal defense to an action. *C. Wright & A. Miller, Federal Practice and Procedure* § 2725, p. 506 (1973). The parties do not question that the allegations in Bone's amended answer, if proven, raise a material fact under Alabama law. A defense to a contract action is present where one party is induced through fraud of misrepresentation to sign a contract even though the party may not have read the instrument. *See, e. g., J. B. Colt Co. v. Price*, 210 Ala. 189, 97 So. 696 (1923); *Brenard Manufacturing Co. v. Cannon*, 209 Ala. 626, 96 So. 760 (1923); *Herzfeld v. Hayne*, 200 Ala. 615, 76 So. 973 (1917); *Moline Jewelry Co. v. Crew*, 171 Ala. 415, 55 So. 144 (1911).[4]

---

The president of the First Bank of Linden would be able to substantiate the fact that Mr. Speights wrote the bank and told them that if I needed money to let me have it and to let me sign the note in behalf of the company.

3. On count one, the district court entered judgment on the face value of the promissory note in the amount of $10,487.50, and stated that a hearing would be held to ascertain the proper interest charges and attorney's fees. The court found Bone liable under the employment contract, and subsequently empanelled a jury to determine the amount of Bone's share of the losses. The jury assessed damages under the

contract at $19,549.78. In its final order and judgment, the district court accepted the jury's finding and awarded damages in the amount found. It also awarded interest on the note in the amount of $839.00, and set reasonable attorney's fees for the collection of the note at $3,460.87.

4. Indeed the particular facts presented in this case may support a finding of fraud even in the absence of any direct representation from Speights. Fraud can be established by silence where the business relationship of the parties is such as to create a duty to disclose certain material facts. *See, e. g., Shelter Modular*

■ The central dispute in this case concerns whether a genuine issue exists as to the question of fraud. Bone contends that a fair reading of his deposition considered in light of his affidavit raises a genuine issue which precludes a grant of summary judgment. To the contrary, Kennett-Murray argues that the deposition unequivocally states that Speights made no representation to Bone relating to either the promissory note or the employment contract and that nothing contained in the affidavit should be permitted to defeat the clear statements contained in the deposition.

■ In considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition. *See, e. g., Camerlin v. New York Central R. Co.*, 199 F.2d 698, 701 (1st Cir. 1952); *Adams v. United States*, 392 F.Supp. 1272, 1274 (E.D.Wis.1975). "An opposing party's affidavit should be considered although it differs from or varies his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility." 6 *Moore's Federal Practice* ¶ 56–15[4], p. 56–522 (2d Ed.) (footnote omitted). *See generally Guarantee Insurance Agency Co. v. Mid-Continental Realty Corp.*, 57 F.R.D. 555, 563(D. C.). Thus, a genuine issue can exist by virtue of a party's affidavit even if it conflicts with earlier testimony in the party's deposition.

Despite this general rule, Kennett-Murray relies on the Second Circuit's decision in *Perma Research & Development Co. v.*

*Singer Co.*, 410 F.2d 572 (2d Cir. 1969), for the proposition that a district court may grant summary judgment where an issue raised by affidavit is clearly inconsistent with earlier deposition testimony. In that case, plaintiff Perma Research alleged that defendant had fraudulently entered into a contract which it never intended to perform. The president of Perma Research was extensively deposed and disclosed no specifics of the fraud claim. In a subsequent affidavit, the president referred to a conversation in which a representative of defendant allegedly stated that defendant had no intention of performing on the contract. The Second Circuit concluded that the district court had properly granted summary judgment since the statement in the affidavit was blatantly inconsistent with the earlier deposition. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research, supra*, 410 F.2d at 578.

The *Perma Research* rationale has been followed by other courts faced with a party's attempt to inject a factual dispute through a contradictory affidavit. For example, in *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540 (9th Cir. 1975), the Ninth Circuit affirmed a grant of summary judgment in a breach of contract case where the only factual issues were raised in a party's affidavit in contradiction of earli-

Corp. v. Cardinal Enterprises, Inc., 347 So.2d 1334 (Ala.1979); *Southern Land Development Co. v. Meyer*, 230 Ala. 40, 159 So. 245 (1935); *Huntsville Dodge, Inc. v. Furnas*, 361 So.2d 585 (Ala.Civ.App.1978). Here, where Bone read and signed a one-year contract of employment and asked the company to prepare a replacement contract, it may be inherent within the confines of the employer-employee relationship that the new agreement would contain essentially the same general provisions absent express disclosure by Kennett-Murray.

In any event, it is clear that if the employment contract was obtained through fraud, then the promissory note may be voidable. A

promissory note must be supported by adequate consideration. *See Oldacre v. Stuart*, 122 Ala. 405, 25 So. 38 (1899). In this case, it is established that Bone had no personal liability under the original employment contract for any losses. Thus, at the time of the signing of the note, Bone was not indebted to Kennett-Murray. While the new employment contract to employ Bone for an additional year may constitute adequate consideration, if that contract was itself a product of fraud, then in the absence of other valid consideration, the promissory note is voidable for want of consideration.

er statements in a deposition. The court acknowledged that the statements in the affidavit were material, but rejected the argument that they created a genuine issue within the meaning of Rule 56. "The very object of summary judgment is to separate real and genuine issues from those that are formal or pretended, so that only the former may subject the moving party to the burden of trial. Here we are convinced that the issues of fact created by *Radobenko* are not issues which this Court could reasonably characterize as genuine; rather, they are sham issues which should not subject the defendants to the burden of trial." *Radobenko, supra,* 520 F.2d at 544 (citations omitted). *See Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 260 (S.D.N.Y. 1978) (affidavit testimony departs "so markedly from the prior deposition of defendants' key witness, . . . as to brand as bogus the factual issues sought to be raised"), *aff'd,* 603 F.2d 214 (2d Cir. 1979). *See generally Bryant v. Western Electric Co.,* 572 F.2d 1087 (5th Cir. 1978); *Holifield v. Cities Service Tanker Corp.,* 421 F.Supp. 131, 136 (E.D.La.1976), *aff'd* 552 F.2d 367 (5th Cir. 1977).

The gravamen of the *Perma Research-Radobenko* line of cases is the reviewing court's determination that the issue raised by the contradictory affidavit constituted a sham. Certainly, every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. *See Choudhry v. Jenkins,* 559 F.2d 1085, 1090 (7th Cir. 1977) (summary judgment was improper even though party's testimony was "not a paradigm of cogency or persuasiveness," since it was not a "transparent sham"), *cert. denied sub. nom. Indiana v. Choudhry,* 434 U.S. 997, 98 S.Ct. 634, 54 L.Ed.2d 491 (1977). In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition.

Given the above concerns, we hold that the district court improperly granted Kennett-Murray's motion for summary judgment. As an initial matter, we note that at one point in his deposition, Bone explicitly stated that he failed to read the employment contract because he "thought it was just like the first one, because he [Speights] said it was the same contract." (Bone's Deposition p. 60). Thus, the alleged inconsistency created by the affidavit existed within the deposition itself.[5] Accordingly, the issue concerning what Speights may have done or said to Bone was appropriately raised by the deposition even without consideration of the affidavit.

Even assuming that the deposition was unequivocal, Bone's affidavit served to create a genuine issue which would preclude summary judgment. Bone's affidavit did not purport to raise a new matter, but rather to explain certain aspects of his deposition testimony. Bone stated that he was confused during the deposition and at one point thought that the questioning concerned the promissory note whereas in fact it related to the signing of the employment contract. Bone's assertion is at least plausible. A fair reading of the deposition reveals frequent shifts in the questioning between the promissory note and the employment contract with a degree of confusion on the parts of both Bone and the attorneys.

The affidavit is not inherently inconsistent with Bone's earlier testimony. Obviously, Bone's answer that Speights said nothing cannot be taken literally. Certainly, one would expect two business associates meeting to sign important documents to exchange some words. Bone may simply have meant that Speights did not affirmatively state anything about the specific content of either document. Such a view would not necessarily foreclose the possibility that Speights made some general remark that the contract was like the earlier version. Furthermore, the statement in the

---

**5.** Bone brought this statement in the deposition to the district court's attention in his Response

to Motion for Summary Judgment (Rec. 96–97).

affidavit is not at odds with Bone's general theory of defense presented in the deposition. Throughout the deposition, Bone made reference to the fact that he believed that he was signing the same contract as before, and that Kennett-Murray somehow "switched" contracts on him. The statement in the affidavit is in accord with that view and cannot be said to constitute a reformulation of Bone's general defense.

In light of the fact that the affidavit is generally consistent with the position forwarded in the deposition, the concerns raised in *Perma Research* and *Radobenko* are not present in this case. Accordingly, we do not decide whether the principles enunciated in those cases should be adopted by this court. While some statements in Bone's deposition differ with those in his affidavit, these conflicts present questions of credibility which require jury resolution. Accordingly, the grant of summary judgment is reversed.

REVERSED.